THE SOUTHERN MENHADEN COMPANY, A CORPORA-
TION, *Appellant*, v. HARLAN W. HOW AND EDWARD
S. HOW, CO-PARTNERS DOING BUSINESS UNDER THE
NAME OF SOUTHERN ENGINEERING COMPANY OR
HARLAN W. HOW COMPANY; MORRIS ENGINEERING
COMPANY; WEBSTER MANUFACTURING COMPANY
AND ORR AND SEMBOWER, CORPORATIONS, *Appellees*.

Opinion filed February 8, 1916.

Rehearing denied March 2, 1916.

1. A clause, in a contract for the construction of a manufactur-
ing plant to be occupied by the owner, providing for the pay-
ment by the contractor to the owner of a specified sum of
money for each day the manufacturing plant should remain
unoccupied after a certain day agreed upon between the par-
ties for the completion of the plant, held to be one for li-
quidated damages and not a penalty where it appears from
the circumstances surrounding the formation of the contract,
the situation of the parties at the time, the certainty that
some damages would accrue to the owner by reason of a
failure to comply with the contract on the contractors' part,
but uncertainty as to amount; the difficulty of ascertaining
the damage that might accrue and the language of the con-
tract, that it was the intention of the parties to stipulate for
damages.

2. It is competent for the parties to a building contract to stip-
ulate for the payment of liquidated damages on the failure
of the contractor to complete the contract on a day named,
where the amount agreed upon from all the circumstances
does not appear to have been so unreasonable as to suggest
an intention of the parties to provide for a penalty.

Appeal from Circuit Court, Duval County; D. A.
Simmons, Judge.

Decree reversed.

*Daniel & Boggs,* for Appellant;

*Bisbee & Bedell, Marks, Marks & Holt* and *L. S. Gaulden,* for Appellees.

ELLIS, J.—The Southern Menhaden Company exhibited its bill in the Circuit Court for Duval County against Harlan W. How and Edward S. How, Co-partners doing business under the names of Southern Engineering Company or Harlan W. How Company; Morris Engineering Company, a Corporation; Webster Manufacturing Company, a Corporation, and Orr and Sembower, a Corporation.

The purpose of the bill seems to have been to obtain an adjudication in this proceeding as to complainants' liability to the How Company on a certain building contract; to ascertain the amount due if any; to restrain the How Company from prosecuting its bill in chancery against the complainants to enforce a builders' lien and to restrain the prosecution at law of suits by Morris Engineering Company; Webster Manufacturing Company and Orr and Sembower, material men, against the complainants to enforce liens for materials, and thus determine in the one proceeding all the issues presented in the other causes.

The cause proceeded through the various stages of original bill, answers, cross-bills, answers thereto, and replications to the taking of testimony and a decree against the complainant, to which it objects and takes this appeal.

Every answer to the original bill contained a demur-

rer on the ground that it contained no matter of equity whereon the court could grant the relief prayed, but the cause proceeded to final adjudication on its merits, and the complainant below, as appellant now, seeks a reversal of the decree.

No question of pleading or practice is involved, and there is little dispute as to the facts. The claims of the material men for materials furnished to the How Company which were used in the construction of complainant's manufactory seem to have been agreed upon by all parties as to amount, the complainant denying that they held liens for such materials upon any part of its plant, because at the time they served notices upon it of their intention to declare liens upon the plant the complainant owed How Company, the contractors, nothing.

The appellant contends that the decree was erroneous because the chancellor construed a clause in the building contract for liquidated damages as a penalty; that the chancellor failed to allow certain indebtedness of the How Company to complainant to be set off by complainant against How Company's claim, and that the chancellor erred in holding that the How Company had substantially complied with their contract.

These questions are presented by the record, and we will discuss them, or so many of them as may be necessary to a determination of this cause. We will not undertake to copy the pleadings nor any part of the testimony, nor the final decree, but will give in substance so much of the proceedings as we deem essential to a clear understanding of the case.

The Southern Menhaden Company is a Florida Corporation which was organized for the purpose of engag-

ing in the business of manufacturing fish oil and ferti-
lizer from a certain species of salt water fish known as
"Menhaden." To this end it became necessary for the
corporation to purchase certain machinery, erect houses
in which to establish the same and provide for the shel-
ter of their employees. While other preparations were
necessary to be made such as acquiring a site for the
manufacturing plant, the employment of fishermen to
catch the fish and other persons to operate the plant when
completed, this cause has to do only with the contract,
entered into by the corporation and How Company for
the furnishing and erection of the machinery, the con-
struction of the houses, and the rights and obligations
springing therefrom. The other matters are of import-
ance only in so far as they constitute the circumstances
surrounding the formation of the contract and may af-
ford some light on the construction of the clause therein
relating to the damages for delay in the completion of
the contract. See Tennessee Manuf'g Co. v. James, 91
Tenn. 154, 18 S. W. Rep. 262; Gobble v. Linder, 76
Ill. 175; Sanders v. Carter, 91 Ga. 450, 17 S. E. Rep.
345; Willson v. City of Baltimore, 83 Md. 203, 34 Atl.
Rep. 774; Wilkinson v. Colley, 164 Pa. St. 35, 30 Atl.
Rep. 286; 8 R. C. L. p. 560.

The Menhaden Company and Harlan W. and Ed-
ward S. How on January 15, 1912, entered into a con-
tract whereby the How Company agreed to furnish to
the owner the Menhaden Company, certain machinery
specified in the contract, of certain capacity and ef-
ficiency, to install the same, and have the plant complete-
ly equipped and in running order and in condition to re-
ceive fish on or before the 11th day of March, 1912.

The owner was to construct the wharves and buildings for the reception of the machinery pursuant to plans to be furnished by the contractors, the How Company. For the machinery and equipment to be thus furnished by the contractors the owner agreed to pay them $32,400.00, and for the erection and superintendence and engineering work in connection with the mechanical equipment the sum of four thousand dollars.

The payments were to have been made as follows: $5,000.00 when the contractors furnished a bond for the faithful performance of the contract; $3,100.00 within days after the furnishing of the bond; $4,860.00 upon the receipt of bills of lading showing shipment of the machinery; $3,240.00 when the factory was in running order to receive fish for the manufacture of them into oil and scrap; at the same time of the last payment in cash to deilver to the contractors six promissory notes of the owner as follows: $4,000.00 payable in four months; $2,000.00 payable in five months; $2,000.00 payable in six months; $2,000 payable in seven omnths; $2,200.00 payable in eight months; and $4,000.00 payable in nine months. The four thousand dollars for the erection and superintendence and engineering work in connection with the mechanical equipment to be paid in cash from time to time as the work progressed. The factory was to have been built at a place about the distance of Fulton on the St. Johns River from Jacksonville. The contract contained the following clause concerning which some trouble between the parties has arisen: "That for each and every day after the said 11th day of March, 1912, the said plant is not in running order in accordance with the terms and conditions of this agreement,

through no fault of the said owner, the said contractor shall pay to the said owner the sum of seventy-five dollars per day as liquidated damages until the said plant shall be in operation in accordance with the terms and conditions hereof." A few days later the contract was amended whereby the owner waived the giving of a bond by the contractor for the performance of the contract and to make the first cash payment of $5,000.00 when Mr. How arrived in Jacksonville, and $3,100.00 within six days thereafter in consideration for which the How Company agreed that the first note for $4,000.00 payable in four months should be withheld for thirty days and delivered upon the fulfillment of the contract "relative to the operation and efficiency of the machinery furnished" by the contractors, and the other notes should be held for the same purpose not exceeding 120 days. On February 8th, 1912, the parties entered into another agreement which was supplemental to and amendatory of the agreement dated January 15, 1912, whereby the contractors agreed to purchase for the owner all material and employ all labor necessary to the erection of certain buildings on the factory site, the owner to pay for such material and labor, to provide a time-keeper and the contractors to approve all bills; they were also to engage all appliances and apparatus necessary to carry the construction forward expeditiously, to prepare all working plans and superintend, oversee and manage the construction until completion, to complete the same within sixty working days after receipt of instructions to proceed, and, "7th. The *penalty* provided in the contract dated January 15th, 1912, shall not begin to run until after the expiration of said sixty working days under the

conditions herein provided." For this extra work the contractors were to receive from the owner "10% of the cost price of labor and material, payable upon completion of the factory. That the completion of the factory wherever mentioned is understood to mean that said factory is to be in condition to receive and manufacture fish oil and fish scrap, in accordance with the conditions contained in said contract, dated January 15th, 1912, except as herein modified." Notice was given to proceed with the work on February 10, 1912. In March an extension of eight days was granted in which the plant should be completed, and on May 21st, the Menhaden Company notified the contractors by letter that the time for the completion of the contract expired on May 5th, and required the contractors to put the plant in "running order immediately" as the owners had contracts with fishermen who would commence to deliver the fish in a few days and the plant should be ready to operate when the fish arrive. The clause in the original contract of January 15, 1912, providing for the payment by the contractor of $75.00 per day for each day the plant was not in running order after the time specified was again referred to, but it was not spoken of as either a penalty or liquidated damages. On July 2nd, 1912, the How Company notified the owner that the factory was ready. On July 3, 1912, the owner acknowledged receipt of such notice, and in a written communication to the contractors stated that the plant was not "ready for operation," and pointed out the reason for such conclusion. It was pointed out that the measuring wheel had not been tested and secured to the floor, no hopper for the measuring machine had been provided to receive the fish from the

elevator; no protection had been provided for the belt running from the engine to the measuring machine; the hoister for the elevator had not been tested; nor were the owners assured that the boilers which had been installed would pass inspection. The letter then stated: "We are ready to make final settlement with you as soon as the above matters have been attended to and we receive a report from you confirmed by our superintendent that they have been attended to." This letter also contained a clause which notified the contractors of certain claims which the owner would insist upon being deducted from any amount due upon final settlement. Then followed ten specifications of deficiencies and imperfections which the owner insisted should be charged to the contractors, as follows: First, a small oil tank to cost about $75.00; second, boiler room floor, which claim the owner waived; third, conveying trough in press house; fourth, wooden flights on the conveyors on the first floor of the press house running to the dryer; fifth, conveyor trough to dryer, conveyor guide and flight and trough to scrap house; sixth, trough for screw conveyor in dry scrap house; seventh, angle irons on raw conveyor over and under fish box on the pier, estimated to cost about $235.00; eighth, hopper at the discharge end of the cooker; ninth, the addition to the building and storage hopper at the receiving end of the cooker, and, tenth, damages for failure of contractors to furnish "proper working drawings, and your lack of personal supervision of the work" to which the owner ascribed "a large part of the delay and therefore we have no hesitancy in claiming the entire amount of liquidated damages as provided in the contract."

On July 10, 1912, The Southern Menhaden Company in reply to an inquiry from the How Company as to the balance due under the contract, made up a statement of account showing a balance due to the How Company of $3,161.04 to be paid in cash, when the Menhaden Company should receive from the How Company an affidavit "showing amount due by you for machinery and equipment, and a list of firms by whom any part of the machinery or equipment was furnished, provided the total amount due by you for said machinery and equipment shall not exceed Twelve Thousand Dollars." This statement made no reference to the notes aggregating $16,200.00, which under the terms of the contract were to have been delivered as follows: The first note for $4,000.00 to be "withheld for thirty days and delivered upon the fulfillment of the contract relative to the operation and efficiency of the machinery furnished," and the other notes aggregating $12,200.00 to be held for the same purpose not exceeding one hundred and twenty days.

The statement condensed was as follows:

Cash payments to be made under
   contract _____$20,200.00
10% Com. on materials, etc.____   2,547.05
10%  "    "  Generator _____      50.00
"Statements 8th inst." _____     390.42

    Total _____                $23,187.47
Payments made by Menhaden
   Company since Jan. 29, 1912_$17,710.00
Paid Bank on order _____   1,500.00
Cash paid July 6th _____    200.00

| | | |
|---|---:|---:|
| Amt. due from How Company as per statement July 1st _____ | 463.43 | |
| Deduction from How Company "Statements of 8th inst." __ | 150.00 | |
| Total _____ | | 20,023.43 |
| Balance due _____ | | $ 3,164.04 |
| Notes to be delivered but not mentioned in statement ____ | | 16,200.00 |
| Total _____ | | $19,364.04 |

On the same day, July 10, 1912, The Southern Menhaden Company wrote the How Company: "In confirmation of our verbal understanding with you that there will be no objection on your part to our deducting from the final notes due you in accordance with the terms of our contract with you for furnishing machinery and equipment for our factory the liquidated damages of $75.00 per day for 50 days, making a total of $3,750.00." The request was made to confirm this by the endorsement of How Company, which was done.

On July 11, 1912, The How Company submitted to the Menhaden Company the affidavit of H. W. How showing amount due for machinery and equipment by the How Company, and a list of firms by whom the machinery was furnished. This affidavit showed an aggregate amount due of $10,116.53, and included the claims of Orr and Sembower, Morris Engineering Company and Webster Manufacturing Company substantially in the amounts named by them in their cross-bills.

On August 8th, 1912, Mr. Pennington as President

of the Menhaden Company in a letter to Dr. L'Engle, another officer of the company, stated that he was delivering the first note of $4,000.00 to Mr. How, "which was due thirty days after the plant was turned over to me." That although the Menhaden Company had 30 days within which to "test the efficiency of the machinery installed by Mr. How," the failure to do so was due to the company's inability to catch fish in the river, and the fact that its boat did not arrive with any fish, and that Mr. How was entitled to his note. The letter called attention to the fact that the note was dated July 8th; that Mr. How notified the company that the factory was ready July 2nd, and, "there was some subsequent correspondence between us and settlement was not made until July 10th;" that when the other notes are "deliverable 90 days from date, Mr. How consents that we shall deduct from said notes the amounts remaining unpaid at that time in connection with his contract, provided, we will give to him letters to his creditors under the terms of which we will assume to pay his obligations," etc.

On September 20th the How Company wrote to the Southern Menhaden Company that the How Company had consented to the deduction of $3,750.00 damages claimed by the Menhaden Company in consideration that the latter company would, assume responsibility for the obligations of the How Company as stated in the list and that as the Menhaden Company had refused to carry out its part of the agreement the matter of the $3,750.00 alleged damages was left open.

The Webster Manufacturing Company, Orr and Sembower and Morris Engineering Company not having been paid the amounts due to them notified the Men-

haden Company of their intention to claim liens against the plant of the Menhaden Company and commenced suits at law to enforce the liens, and in July, 1913, the How Company instituted its suit in chancery to enforce a lien claimed by them against the plant of the Menhaden Company claiming $12,200.00 as the balance due, with interest and attorneys' fees. This was the situation when the Menhaden Company, appellants, filed its bill in this cause for the purpose stated.

Upon final hearing, the testimony having been taken before the Chancellor and preserved in writing, a decree was entered adjudging the Menhaden Company to be indebted to the How Company in the sum of $12,200.00 for labor performed and materials furnished in the construction of the manufactory; that the Menhaden Company was entitled to set-off against that sum the amount of $4,939.15 on "account of the failure of the plant to comply in certain respects with the contract under which it was constructed;" that the judgment which the Menhaden Company had obtained against the How Company in March, 1913, for $2,064.15 was included in and satisfied by the decree, and that all questions raised by the pleadings were included in and settled by the decree; that the claim of the Menhaden Company for $3,750.00 against the How Company for alleged delay in completing the plant provided for a penalty, and not liquidated damages, and that the Menhaden Company had suffered no damage whatever by reason of the delay, and that it was not entitled to the penalty by reason of any agreement alleged to have been made after July 5, 1912, and the claim was disallowed; that after deducting the $4,939.15 from the principal sum of $12,200.00, there re-

mained due and owing to How Company by the complainants the sum of $7,260.85, which with interest to the date of the decree, $1,379.54, and attorneys' fees amounting to $864.03, made the total sum of $9,504.42; that the How Company was entitled to have a lien upon and the same was adjudged to exist against the manufacturing plant and land upon which it was located; that the How Company was indebted to the material men named in the pleadings for principal, interest and attorneys' fees as follows: Orr and Sembower, $2,139.37; Webster Manufacturing Company $1,115.20, and Morris Engineering Company $4,143.78, and liens were declared to exist in their favor upon certain machinery of the complainant's plant. The Menhaden Company was ordered to pay to Orr and Sembower, Webster Manufacturing Company and Morris Engineering Company the said amounts of their respective liens within ten days, and to How Company the balance of $2,106.07 within that time, and in default of such payment, the property should be sold in satisfaction of the liens by a special master.

The original bill and amendment thereto alleged that complainants obtained a judgment in March, 1913, against How Company in the sum of $2,067.69, that the judgment had never been satisfied nor had any payment been made thereon, and that in December, 1912, the John Wood Manufacturing Company recovered judgment against the complainants and How Company in the sum of $252.42 for material furnished to How Company in the construction of the plant, and that judgment had not been satisfied, but complainants had agreed to pay it on or before July, 1914. These two items complainant

claims should be allowed as a set-off against whatever amount the court should find to be due by them to How Company. These allegations as to the judgment obtained by complainant against How Company, and the one obtained by John Wood Manufacturing Company against complainant and How Company and the former's promise to pay it were by stipulation appearing in the testimony admitted to be true.

The complainant's bill alleged that the How Company failed to substantially comply with their contract; that the plant was fatally and totally deficient and defective in the particulars named in the bill; that these defects were pointed out to the How Company, but they ignored the complaint and abandoned their contract, and complainant had never accepted the plant as completed, and that by reason thereof it owed How Company nothing under the contract, and was not indebted to them at the time Orr and Sembower, Webster Manufacturing Company and Morris Engineering Company served notice of their intention to claim liens upon complainant's plant; that the clause in the original contract providing for the payment of $75.00 per day by How Company for each day's delay in the completion of the plant provided for liquidated damages and not a penalty, and that it was entitled to receive from the How Company $3,-750.00 for 50 days delay to July 2, 1912, on account thereof.

The How Company in their answer denied that they had failed to comply with their contract, and denied that the plant was defective or inefficient, and averred that the clause above mentioned provided a penalty, and not liquidated damages. The cross-bill of the How Company alleged a full compliance with the contract and

prayed for the enforcement of their lien against the Menhaden plant.

We think that the conclusion of the Chancellor as to the balance remaining due from the Southern Menhaden Company to Harlan W. How and Edward S. How for labor and materials furnished in the construction of the manufacturing plant of the Southern Menhaden Company, and that the claim of that company against Harlan W. How and Edward S. How for $3,750.00 for alleged delay in the completion of the plant is for a penalty and not liquidated damages, is error. The clause in the original contract providing for the payment of $75.00 for each day the completion of the plant should be delayed from the date agreed upon provides for liquidated damages, and is not a penalty. There is nothing to show that the delay in the completion of the plant was due to any fault of the appellant. There seems to have been an agreement between the parties as to the number of days the plant remained uncompleted. It was conceded that How Company notified the Menhaden Company on July 2, 1912, that the plant was completed. May 5th was the day upon which the parties seem to have agreed that the plant should have been finished; between those dates there seem to have been fifty working days after allowing for bad weather and other unavoidable delays.

The circumstances surrounding the parties to the contract at the time they entered into it, were known to all of them. The construction of an oil and fertilizer plant in which Menhaden fish were to constitute all, if not the greater part, of the raw material, was a new enterprise in that section of the State; the plant was to be occupied by the owner as soon as completed; a large sum of money was necessary to be invested in a site for the plant,

and for buildings and machinery; preparations had to be made for furnishing the fish to the plant, which necessitated the employment of fishermen, perhaps the purchase of boats and possibly contracts for the purpose of fish, employees engaged to operate the plant, and fuel provided for the furnaces. These and perhaps other matters of detail had to be arranged and provided for the beginning of operations on the day agreed upon when the plant should be finished according to the contract. These conditions and requirements were all known to How Company, because they were "mechanical and contracting engineers," and had much experience in constructing similar manufactories. In the event the plant should not be completed and the contract finished on the day named against which the owner had to make preparations for the occupancy of it and the beginning of work, the actual damages sustained per day would be exceedingly difficult to ascertain, if not impossible to measure by any standard. The loss of interest upon the thousands of dollars invested would not be the only damage; the loss to the owner of the services of empolyees, the cost of keeping the fish or their possible total loss, the expense of procuring them, the disorganization of the labor force and many other items would seem to enter in and contribute to the owner's damage from not being able to get possession of its factory on the day named. In such case we think that it was competent for the parties to stipulate for liquidated damages, especially where the amount agreed upon does not appear to have been so unreasonable as to suggest an intention of the parties to provide for a penalty. 1 Sutherland on Damages, 490; 1 Pomeroy's Eq. Jur. 440; Tennessee Manuf'g Co. v. James, 91 Tenn. 154, 18 S. W. Rep. 262; Sanders v.

Carter, 91 Ga. 450, 17 S. E. Rep. 345; 1 Sedgwick on Damages, (8th ed.) §§396, 403, 405; Jaquith v. Hudson, 5 Mich. 123, cited with approval in Smith v. Newell, 37 Fla. 147, 20 South. Rep. 249; 8 R. C. L. "Damages," §§110-118; Kilbourne v. Burt & Brabb Lumber Co. 111 Ky. 693, 64 S. W. Rep. 631, 55 L. R. A. 275; Monmouth Park Ass'n v. Wallis Iron Works, 55 N. J. L. 132, 26 Atl. Rep. 140, 19 L. R. A. 456; Bilz v. Powell, 50 Colo. 482, 117 Pac. Rep. 344, 38 L. R. A. (N. S.) 847; Crawford v. Heatwold & Hedrick, 110 Va. 358, 66 S. E. Rep. 46, 34 L. R. A. (N. S.) 587; Ross v. Loescher, 152 Mich. 386, 116 N. W. Rep. 193.

The sum stipulated does not appear to be disproportionate to the probable damage that the complainant might have sustained; the parties could not compute with certainty the probable damage, it would have been difficult, perhaps impossible to prove the actual loss or damage resulting to complainant from the failure to complete the plant on the day named, yet there would be no doubt that damage would result equal to if not in excess of the amount stipulated    The parties knew exactly their own situation and were in better position than anyone else to appreciate and make provision for the consequences of a failure to complete the contract on the day named.   This language is in substance that of Judge White of Colorado in the case of Bilz v. Powell *supra*, and we think it peculiarly applicable to the circumstances of this case.   See also Madler v. Silverstone, 55 Wash. 159, 104 Pac. Rep. 165.

We think, therefore, that the sum of $12,200.00 found by the Chancellor to be due from the Southern Menhaden Company to Harlan W. and Edward S. How should have been reduced by the sum of $3,750.00, the amount of liquidated damages.

The decree is uncertain as to the Chancellor's intention to include in the sum of $4,939.15, the amount allowed as a set-off to the Southern Menhaden Company against the claim of Harlan W. and Edward S. How, the judgment of $2,064.15 held by the Southern Menhaden Company against Harlan W. and Edward S. How, and the judgment of the John Wood Manufacturing Company against the How Company and the appellant for $252.42, both of which amounts making a total of $2,316.57 with the interest included should have been allowed as a set-off to the appellant against the claim of the How Company.

The decree is reversed with directions to enter a decree in conformity with this opinion.

TAYLOR, C. J., and SHACKLEFORD and WHITFIELD, JJ., concur.

COCKRELL, J., absent by reason of sickness.